J-A19031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JAMIL JOHNSON | No. 2454 EDA 2015 |

Appeal from the Order July 15, 2015
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s):CP-51-CR-0011362-2014

BEFORE: FORD ELLIOTT, P.J.E., OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED DECEMBER 27, 2016**

The Commonwealth appeals from the order entered in the Philadelphia County Court of Common Pleas granting Appellee's, Jamil Johnson, motion for judgment of acquittal for conspiracy. We reverse and remand for reinstatement of the jury verdict and for sentencing.

The trial court summarized the procedural posture of this case as follows:

> Defendants, Derrick Harling[1] and [Appellee], were arrested on September 18, 2014, and charged with robbery, conspiracy, theft by unlawful taking, receiving stolen property, simple and aggravated assault and recklessly endangering another person. [Defendant Harling and Appellee] were held for court on all charges

---

Former Justice specially assigned to the Superior Court.

[1] The Commonwealth's appeal of the trial court's grant of relief to Appellee's codefendant, Derrick Harling, is listed at 2453 EDA 2015.

after a preliminary hearing on October 6, 2014. A joint jury trial commenced July 9, 2015. A motion for acquittal was presented at the conclusion of the prosecution's case[2] and held in abeyance until after the jury returned a verdict. On July 14th, the jury found [Appellee and Harling] guilty of conspiracy to commit aggravated assault, but acquitted both [of them] of all other charges, including aggravated assault. On July 15th, the motion for acquittal was granted as to the charge of criminal conspiracy to commit aggravated assault.

Trial Ct. Op., 10/28/15, at 1-2. This timely appeal followed. The Commonwealth filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal and the trial court filed a responsive opinion.

Preliminarily, we consider whether an appeal properly lies from the trial court's order granting judgment of acquittal. Appellee argues that the order constituted an acquittal for double jeopardy purposes and that the Commonwealth's appeal should be barred. Appellee's Brief at 10-13 (citing, *inter alia*, **Commonwealth v. Gibbons**, 784 A.2d 776 (Pa. 2001)). The Commonwealth responds that its appeal is proper because there is no possibility of a successive prosecution implicating the double jeopardy clause.[3] Commonwealth's Reply Brief at 4-6. We agree with the Commonwealth.

_____

[2] Counsel for Appellee moved for judgment of acquittal. **See** R.R. at 82. Defendant Harling's counsel joined in the motion. **See id.** For the parties' convenience we refer to the reproduced record where applicable.

[3] The Fifth Amendment provides, in pertinent part, that no person "Shall be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Article 1, Section 10, of the Pennsylvania

In **Gibbons**, the defendant moved for a judgment of acquittal after the Commonwealth presented its case, and the trial court granted the motion before the defense's case-in-chief. **Gibbons**, 784 A.2d at 777. Our Pennsylvania Supreme Court held that double jeopardy precluded an appeal of a judgment of acquittal granted before a verdict was rendered. **Id.** at 778.

This Court in **Commonwealth v. Feathers**, 660 A.2d 90 (Pa. Super. 1995) (*en ban*c) opined:

> In **United States v. Wilson**, [ ] 95 S. Ct. 1013 [ ] (1975), the Supreme Court held "that when a judge rules in favor of the defendant after a verdict of guilty has been entered by the trier of fact, the Government may appeal from that ruling without running afoul of the Double Jeopardy Clause." **Id.** [ ] at 1026 [ ]. The Court said:
>
>> [W]here there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended. In various situations where appellate review would not subject the defendant to a second trial, this Court has held that an order favoring the defendant could constitutionally be appealed by the Government. Since the 1907 Criminal Appeals Act, for example, the Government has been permitted without serious constitutional challenge to appeal from orders arresting judgment after a verdict has been entered against the defendant. Since reversal on appeal would merely reinstate the jury's verdict, review of such an order does not offend the policy against multiple prosecution.

---

Constitution provides, in relevant part, that "no person shall, for the same offense, be twice put in jeopardy of life or limb." Pa. Const. art. 1, § 10.

> *Id.* [ ] at 1022 [ ] (footnote omitted).

> * * *

> [W]here a court finds as a matter of law the evidence is not sufficient to support the verdict, that, like any other ruling on a question of law, is subject to review, and **an order by the reviewing court** reversing that conclusion and **reinstating the jury verdict does not offend the proscription against double jeopardy**.

*Id.* at 93-94 (emphases added).

Instantly, although Appellee raised his motion for judgment of acquittal at the close of the Commonwealth's case, the trial court reserved its ruling on the motion until after the defense presented its evidence and the jury reached a verdict.[4] *See* Pa.R.Crim.P. 606(A)(1), (B). Thus, an appellate reversal would not necessitate a retrial. On the contrary, the jury verdict would be reinstated. *Feathers*, 660 A.2d at 93-94; *cf. United States v. Scott*, 437 U.S. 82, 100 n.13 (1978) (discussing balancing of interest in the government's right to appeal an erroneous conclusion of law with the defendant's in avoiding subsequent prosecutions). Accordingly, the trial court's order is appealable and we address the substantive issue raised by the Commonwealth. *See id.*

The Commonwealth raises the following issue for our review:

---

[4] We note that Appellee renewed the motion following the jury verdict. Counsel for Appellee stated: "This is a continued motion for directed verdict of acquittal." R.R. at 124.

Did the lower court improperly grant [Appellee's] motion for a judgment of acquittal from his conspiracy conviction where the evidence established that [Appellee] and his codefendant, joined by three other men, approached the victim [Martin Samuel Byng] together, beat the victim together, fled the scene together, and, a short time later, were arrested together?

Commonwealth's Brief at 2.

The Commonwealth contends "[t]he evidence, which established that [Appellee] and four conspirators viciously beat [Mr. Byng] for fifteen minutes, was sufficient to support [Appellee's] conviction of conspiracy to commit aggravated assault." *Id.* at 8. The Commonwealth argues that the trial court erred in granting Appellee's motion for judgment of acquittal based "on its belief that [Mr. Byng] had not testified credibly." *Id.* at 12. We are constrained to agree.

Our review is governed by the following principles.

[W]here a trial court has found post-verdict that the evidence was insufficient as a matter of law to support the verdict, that determination is subject to appellate review . . . .

\* \* \*

To determine the legal sufficiency of evidence supporting a jury's verdict of guilty, this Court must:

view the evidence in the light most favorable to the Commonwealth, which has won the verdict, and draw all reasonable inferences in its favor. We then determine whether the evidence is sufficient to permit a jury to determine that each and every element of the crimes charged has been established beyond a reasonable doubt. It is the function of the jury to pass upon the credibility of the witnesses and

- 5 -

to determine the weight to be accorded the evidence produced. The jury is free to believe all, part or none of the evidence introduced at trial. The facts and circumstances established by the Commonwealth need not be absolutely incompatible with [the] defendant's innocence, but the question of any doubt is for the jury unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

*Feathers*, 660 A.2d at 94-95 (quotation marks and citations omitted).

The Pennsylvania Crimes Code defines conspiracy as follows:

**(a) Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

\* \* \*

**(e) Overt act.**—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903(a), (e).

A criminal conspiracy conviction requires proof of:

(1) an intent to commit or aid in an unlawful act, (2) an agreement with a co-conspirator and (3) an overt act in furtherance of the conspiracy. Because it is difficult to prove an explicit or formal agreement to

commit an unlawful act, such an act may be proved inferentially by circumstantial evidence, *i.e.*, the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators.

Circumstantial evidence can include, but is not limited to, the relationship between the parties, the knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. These factors may coalesce to establish a conspiratorial agreement beyond a reasonable doubt where one factor alone might fail.

\* \* \*

The Commonwealth may meet this burden even if the conspirators fail to commit the underlying crime. Conspiracy to commit a crime and the underlying crime itself are two entirely separate offenses with separate elements required for each. Therefore, to sustain the conviction for criminal conspiracy, it need not be established that [the a]ppellant committed aggravated assault, provided that [the a]ppellant had the intent to do so.

***Commonwealth v. Thomas***, 65 A.3d 939, 943-44 (Pa. Super. 2013)

(quotation marks and citations omitted).

Instantly, Mr. Byng testified for the Commonwealth as follows:

[The Commonwealth]: Now, Mr. Byng, while you were waiting for the bus [on September 18th], did something happen?

A: Yes.

Q: What happened?

A: Well, I was approached by two men, one on a bike . . . .

\* \* \*

- 7 -

Q: Were they either of the two Defendants who are here today?

A: No.

* * *

Q: What happened when they came up to you . . .?

A: One guy asked did I say something to his cousin and I replied no.

Q: You said you didn't know them.

Had you ever seen either of them before?

A: No.

Q: After you said no, what happened?

A: They proceeded to walk off and as they were walking off, I was looking to see which direction they were going and words were exchanged.

* * *

Q: When you say words were exchanged, what happened?

A: They must have felt some kind of way at me looking at them and all of a sudden they started calling theirs friends like I was really a big problem or something.

* * *

Q: Now were you able to hear anything that they were calling out to those people?

A: As far as names, no, just trying to get other people's attention.

Q: As they were calling out to them, were they still approaching you?

A: Yes.

Q: You mentioned that they were coming kind of aggressively, you mentioned like with anger in their faces?

A: Yes.

Q: What happened when they kept coming close to you?

A: I started backing up when I seen [sic] I was basically about to be outnumbered. I started to walk up toward where the Family Dollar is at.

Q: Now as they were coming closer to you and you mentioned they called out to some other individuals, those individuals that you saw down the block, what did you see them do, if anything?

A: Basically coming toward me, coming toward me and surrounding me and they proceeded to assault me.

* * *

Q: [A]pproximately how many people in total came up to you eventually?

A: Five.

Q: Any of the individuals that came up to you, do you recognize anybody in the courtroom from that day?

A: Yes, I do.

Q: Who are those people?

A: Those two gentlemen over there. (Indicating).

* * *

Q: . . . I will start with [Appellee] who is closer to the center of the room. (Indicating).

When did you first notice him?

* * *

A: After I got up off the ground.

* * *

Q: Next, I am going to ask next about Defendant, Harling . . . .

When did you first notice him?

* * *

Again, if you can just use the photo.

A: Coming from across here, up toward Germantown Avenue. (Indicating).

* * *

Q: Now, you mentioned assault. . . .

What was the first contact?

A: The first contact is when I attempted to cover my face and I started feeling hits, blows toward my body and toward my head.

* * *

Well, I just felt multiple hits coming from just about every direction.

Q: Where were you feeling the hits on your body?

A: More toward my head.

Q: Did you feel any hits on your body, itself, or were they all around your head?

A: When I was covering my head, I felt hits on my body . . . .

* * *

Q: Did you feel hits from just one person or multiple people?

A: Multiple.

* * *

Q: Mr. Byng, your glasses, did they stay on the entire time?

A: No.

Q: Do you recall at what point they came off?

A: When I fell to the ground in front of the bus stop.

Q: How did they come off?

A: They were knocked off.

Q: How were they knocked off?

A: From a punch.

Q: While you were on the ground, what were the individuals doing?

* * *

Did the punches stop at that time?

A: The punches did stop at that time and I was getting up.

* * *

Q: As you are getting up, were the individuals still there?

A: They started splitting up and stuff. As words were exchanged again and stuff, people started coming closer, still talking more aggressively. It was just a mess.

Q: I want to go back to [Appellee]. You mentioned when you got up, that is when you noticed him?

A: Yes.

Q: What, if anything, did you see him do?

A: He came across the street toward me.

*   *   *

Q: Now was that after—

A: I fell?

Q: Yes.

A: Yes.

Q: When he came across the street toward you, did you hear him say anything?

A: I don't recall the words exactly but I know that when he approached me, he had his hands up in a fighting stance.

Q: You can indicate for the jury how he had his hands up.

A: Just like ready to throw punches at me. (Indicating).

Q: As he came across the street, was he directing his attention to anybody but you?

A: No, no.

Q: You say that he came across the street looking like he was ready to fight.

What happened as he came across the street?

A: I was about to defend myself and then another gentleman said don't put your hands on him.

Q: The gentleman that you say said don't put your hands on him, do you see that individual in court today?

A: Yes, I do.

Q: Who is that person?

A: The gentleman on the far right.  (Indicating).

[The Commonwealth]: Indicating the Defendant, Harling.

Q: Now when the Defendant, Harling, said that, where was he?

A: He was, as I was in the street right here and getting up, the Defendant was coming across. . . .

Q: How far away was he from you?

A: About 8 feet.

* * *

Q: When he said that, what did you take that to mean?

A: That I was getting ready probably to get assaulted again if I even threw a swing.

Q: After he said that, what happened?

A: I was hit again.

Q: Who were you hit by?

A: By [Appellee] right there.  (Indicating).

Q: [Appellee], the one closer?

A: Yes.

Q: Where were you hit at that time?

A: In my face.

* * *

Q: When [Appellee] hit you, did he just hit you one time or did something else happen?

A: Two hits.

- 13 -

Q: Where were these two hits? . . .

A: [T]o my head and to my jaw.

\* \* \*

Q: After you got back up, what happened?

A: I was looking for my glasses. A couple of my family members came up because they heard about the incident through a friend who was driving by and maybe two minutes later, the police arrived and that was basically the incident.

Q: Now, Mr. Byng, during this whole altercation, did you see what, if anything, Defendant, Harling, did he ever throw a punch at you?

A: When he was approaching me in the beginning, he was one of the guys who was approaching me.

Q: So that first fight I guess we can call it when you mentioned you were kind of going toward Family Dollar that ended up back toward the bus stop—

A: Correct.

Q: During that fight—

A: Yes.

Q:—you are saying Defendant, Harling, was there?

A: Yes.

Q: He also threw a punch?

A: Yes.

\* \* \*

Q: Now, after the punches stopped, could you try and engage or tell how long the entire attack took?

A: More or less, 15, maybe 25 minutes, around that time frame.

* * *

Q: Now after the assault, you said everybody kind of scattered?

A: Yes.

Q: At the point when they scattered, did you hear any sirens, any police sirens?

A: Yes, like two minutes later.

* * *

Q: During that time, you said it was about two minutes, what were you doing during that time?

* * *

A: I was mainly looking for my glasses and I realized my phone wasn't on me.

Q: Did you look for your phone?

A: I did.

Q: Were you able to find it?

A: I didn't and I realized my whole pocket was ripped and my shirt was ripped. Basically everything was just bloodied and ripped on me.

* * *

Q: How did you physically feel after the assault?

A: Violated.

Q: Did you feel any pain at all? Did you feel fine?

A: I felt pain and stuff. My whole inner lip was cut and later on got infected but [sic] bruising on my head, a closed eye.

\* \* \*

Q: . . . When the police got there, what happened?

A: They asked me the situation that happened. I told them the situation. The ambulance had checked on me and they checked my bruising and scar and they said I am able to comprehend and all that, so I can go with the police to see if I can identify the subjects before they ran anywhere else or anything like that and I told the police officer I was fine at the time, fine enough to go and get in the back of the police car and identify.

\* \* \*

Q: Do you know where you went?

A: Down Germantown Avenue . . . .

\* \* \*

Q: As you went in that direction, what happened?

A: I noticed to the right of me going down Germantown Avenue one of the assailants was sitting outside with a female.

Q: The person that you saw sitting outside, do you see that individual in court today?

A: Yes, I do.

Q: Who is that?

A: The gentleman to the far right. (Indicating)

\* \* \*

[The Commonwealth]: Indicating the Defendant, Harling, for the record.

* * *

Q: I want to briefly just go back for a moment.

After you got up, you said you saw [Appellee], and that is when he was kind of squared with you.

Was there anything covering his face?

A: No.

* * *

Q: Was Defendant, Harling, behind [Appellee] at that point in time?

A: No.

Q: Where was he?

A: To the side.

* * *

Q: Now, you mentioned that the police car did a U-turn?

A: Yes.

Q: What happened as it did the U-turn?

A: The police car did the U-turn, stopped directly in front of the house, got out of the car, attempted to knock on the door. Someone answered. The police went in and pulled out [Defendant Harling and Appellee].

* * *

Q: What happened when the brought them out?

A: They came out and I identified them as two of the five men that assaulted me and they proceeded to arrest them.

R.R. at 30-39.

Police Officer Leo Jackson testified that on September 18, 2014 he was working the 4:00 p.m. to midnight shift. *Id.* at 66. He testified to the following.

> [The Commonwealth]: Officer Jackson, around 10:20 p.m. on September 18, 2014, did you get a radio call?
>
> A: Yes.
>
> Q: What was it for?
>
> A: It was for a robbery in progress at 5200 Germantown Avenue.
>
> \* \* \*
>
> Q: When you got that radio call, what did you do?
>
> A: We turned our lights and sirens on and proceeded to 5200 Germantown Avenue.
>
> Q: About how long did it take you to get there?
>
> A: I would say about a minute-and-a-half to two minutes.
>
> Q: When you got there, what did you see?
>
> What happened?
>
> A: I observed the victim, the complainant standing on, I believe, the east corner of Germantown and Ashmead. I observed him standing there. He flagged us down and I also observed the swollen—pretty bad swelling to his left eye. He was also bleeding. I believe he had a cut on his eyebrow and there was blood all over his shirt.
>
> Q: When you came into contact with him, what was his demeanor like? What was going on?
>
> A: He appeared pretty calm but also a little shaken up. He also told us he was jumped by a group of males and they had taken his cell phone.

- 18 -

Q: After he gave you that information, what did you do?

A: We got the information, the description of the males, gave that description over radio and then he got into the back of our car and we started driving around, looking for the males with the complainant.

\* \* \*

Q: Now you said complainant, would that be Mr. Martin Byng?

A: Yes.

\* \* \*

Q: Where did you go?

A: We started surveying— . . .we pretty much immediately made a U-turn and began driving southbound on Germantown from Ashmead Street, which is the 5200 block.

At that point, . . . we passed the house and I don't remember his exact words but Mr. Byng stated, oh, that's one of the guys that was sitting out front of the house and he kind of pointed over his right shoulder. So we quickly made another U-turn. At that point, we saw the door close from the house.

\* \* \*

Q: Officer, after Mr. Byng indicted to you that he saw one of the guys, what did you do?

A: We stopped the car, turned around and then we called over radio to let other units know that the complainant saw a male suspected of being involved in the crime go into the house.

\* \* \*

[Defendant, Harling's counsel]: Now you said that other officers entered 5118?

A: Yes.

Q: There were approximately four or five officers that entered this address?

A: I believe around that. I'm not sure of the exact number.

Q: When they exited the address, two officers were holding Mr. Harling?

A: I don't remember the exact number of officers holding.

*Id.* at 66-68, 70-71.

Officer Dennis Murtha testified that he was with his partner and responded to a radio call that a man "was struck numerous times and robbed of his cell phone." *Id.* at 72.

[The Commonwealth]: Based on the information that came over [sic] radio . . . what did you and your partner do?

A: We responded to 5118 Germantown Avenue. . . . [W]e knocked on the door. An occupant came down. She stated that she was the owner of the property.

We explained to her that a robbery just happened around the corner and that the offenders were seen running into this location. We asked if we could come in and take a look. She happily agreed. We went inside.

*Id.* Officer Murta testified that he and the other officers "went up the stairs" and "there was a bedroom at the top of the steps." *Id.* at 73. They went inside and found Appellee and Defendant Harling in the room. *Id.* Mr. Byng positively identified Appellee. *Id.* at 74.

The trial court granted Appellee's motion for judgment of acquittal finding that:

> [t]he prosecution's case was based on the testimony of Martin Byng, the complainant in this matter. Mr. Byng was the sole witness as to the alleged assault/robbery, and his testimony was incongruent at best.
>
> * * *
>
> Byng's testimony was inconsistent at best. Two males approached him and asked him a question. After they walked away, Byng started to yell and curse them. They came back. After that, the testimony of Byng is so conflicting as to be irreconcilable.
>
> * * *
>
> Byng's testimony is so incongruent that the charge of criminal conspiracy to commit aggravated assault was not made out. . . . There is no rational, dependable testimony from which to find that [Appellee and Defendant Harling] conspired to commit aggravated assault of Byng.

Trial Ct. Op. at 2, 7-8. The court further questioned the reliability of Byng's identifications noting Byng testified that his glasses were knocked off and he could only see a few feet without them. *Id.* at 4.

Following our review, we cannot agree with the trial court that the evidence was so weak and inconclusive that as a matter of law, no probability of fact could have been drawn from it. *See Feathers*, 660 A.2d at 94-95. The Commonwealth was entitled to have its evidence credited and all reasonable inferences drawn in its favor. *See id.* In this light, the jury could have reasonably concluded that Appellee and Defendant, Harling acted together with three other men and beat Byng for fifteen minutes. They fled

and Appellee and Defendant Harling were apprehended in the same house. Byng identified Appellee, without hesitation. Additionally, the circumstances of and inconsistencies in Byrd's testimony generally go to the weight rather than sufficiency of the evidence.[5] *See Commonwealth v. Minnis*, 458 A.2d 231, 233-34 (Pa. Super. 1983). Thus, we conclude that the Commonwealth's evidence was sufficient to sustain Appellee's conviction for conspiracy to commit aggravated assault. *See Thomas*, 65 A.3d at 943-45. Accordingly, we must reverse the judgment of acquittal and reinstate the jury verdict. *See Feathers*, 660 A.2d at 96. We remand for the imposition of sentence. *See id.*

Order reversed. Jury verdict reinstated. Case remanded for sentencing. Jurisdiction relinquished. Commonwealth's Petition to File Post-Argument Communication Pursuant to Pa.R.a.P. 2501 is denied as moot.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/27/2016

---

[5] We note that the trial court issued a *Kloiber* instruction. *See Commonwealth v. Kloiber*, 106 A.2d 820 (1954). R.R. at 110.